IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| TALLI J. MCFADDEN | : | CIVIL ACTION |
| | : | |
| v. | : | No. 17-5787 |
| | : | |
| ODEIDA DALMASI | : | |
| *MEDICAL & CLINICAL DIRECTOR,* | : | |
| et al. | : | |

### MEMORANDUM

**Juan R. Sánchez, C.J.**                                        **November 21, 2019**

Plaintiff Talli J. McFadden brings this civil rights action pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), asserting claims for violations of his Eighth and Fifth Amendment rights against three medical providers who treated him for a broken nose and a nasal condition while he was in the custody of the Federal Detention Center (FDC) in Philadelphia. Each of the medical providers—Defendants Dr. Odeida Dalmasi, Nurse Practitioner Christine Nelson, and Nurse Akinwale Sogo—has filed a separate motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because there is no genuine issue of material fact regarding whether Defendants acted with deliberate indifference, the Court will grant Defendants' motions.

### FACTS[1]

On Sunday, March 6, 2016, McFadden, a pretrial detainee at the FDC, was involved in a fight with four other inmates. During this fight, McFadden was hit in the face with a padlock in a sock and was sprayed with pepper spray by a correctional officer. McFadden testified he was hit

---

[1] In evaluating a motion for summary judgment, a court must "view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The facts presented herein are undisputed unless otherwise noted. Where the facts are disputed, the Court views the facts in McFadden's favor.

in the face with the lock multiple times. After the fight, McFadden was taken to the Special Housing Unit (SHU) to be separated from the other inmates and to be assessed by medical staff.

After assessment by prison medical staff, McFadden was referred to outside specialists and was eventually diagnosed with a "comminuted nasal fracture," otherwise known as a broken nose. Since the initial injury, McFadden has experienced symptoms of extreme pain, swelling, dizziness, headaches, and difficulty breathing. To address these symptoms, an independent ear, nose, and throat specialist recommended Flonase for treatment. McFadden asserts this treatment did not successfully alleviate his symptoms and faults Defendants for failing to provide a different adequate treatment. As discussed in greater detail below, McFadden argues Defendants were deliberately indifferent to his serious medical needs by (1) failing to provide him with ibuprofen in the first five days after his injury, (2) failing to prescribe an oral decongestant after Flonase did not alleviate his symptoms, (3) failing to seek a second opinion after Flonase did not alleviate his symptoms, and (4) not providing him with any treatment after August 2016, when he stopped using Flonase.[2]

After the fight on March 6, 2016, Nurse Sogo was the first to see McFadden and assessed him within an hour of his injury. Because the incident occurred on the weekend, Nurse Sogo was the only medical personnel on duty. Nurse Sogo cleaned McFadden's abrasions with iodine and assessed him for neurological injuries but did not request an x-ray or any other emergency care for

---

[2] The summary judgment record in this case is robust; the parties have submitted over 150 exhibits. The Court would normally summarize all relevant facts, however, McFadden significantly narrowed his claims at oral argument. Based on McFadden's counsel's statements at oral argument, he has abandoned any arguments or claims that challenge the adequacy of Defendants' care from the time Dr. Dalmasi reviewed the x-ray of McFadden's nose on March 11, 2016, until McFadden discontinued the use of Flonase sometime in August 2016.

Also, McFadden's briefing appears to challenge other aspects of Defendants' conduct. For completeness, the Court addresses the additional arguments although they do not affect the Court's determination of the motions.

him. In Nurse Sogo's assessment, McFadden did not require emergency medical care because he did not appear to have a concussion. *See* Sogo Dep. 95:23–96:3 (stating if inmate presented symptoms of a concussion he would have sent inmate to the hospital); *id.* 99:16–100:2 (stating McFadden presented no symptoms of having a concussion). McFadden claims that during the assessment, he told Nurse Sogo he was in pain.[3] *See* McFadden Dep. 88:2–88:14. However, there is no evidence McFadden requested pain medication, and Nurse Sogo did not give him any. McFadden also claims that later that evening, he asked Nurse Sogo for ice for his nose. Nurse Sogo stated he would bring ice but never did.[4]

Nurse Sogo took photos of McFadden and created a report of the encounter stating, "superficial laceration to nose, facial swelling also noted. Abrasion to right knuckles." *See* Defs.' Ex. 8. Consistent with FDC procedures, Nurse Sogo spoke to the on-call FDC physician that same evening to discuss his assessment of the inmates involved in the fight. Nurse Sogo was also required to have his assessment and clinical encounter note co-signed by an FDC physician. Nurse Sogo knew a physician would follow up on his clinical encounter the next day and recommend any necessary treatment.

Early the next morning, on March 7, 2016, Dr. Dalmasi, a medical doctor and the clinical director at the FDC, reviewed Nurse Sogo's clinical encounter note and signed off on it. Based on the information provided in the clinical encounter note, Dr. Dalmasi immediately ordered an x-ray for McFadden's nose.

---

[3] Nurse Sogo disputes that McFadden claimed he was in pain during the encounter, and his clinical encounter note states McFadden "denies pain at this time." Defs.' Ex. 8.

[4] Nurse Sogo cannot recall whether McFadden asked him for ice for his nose on the night of March 6, 2016. *See* Sogo Dep. 101:23–101:25.

Also on March 7, 2016, Nurse Practitioner Nelson saw McFadden for a pre-existing sick call unrelated to his nose injury. McFadden testified that during this clinical encounter, he told Nurse Practitioner Nelson he was in pain and that he could not breathe out of his nose.[5] Nurse Practitioner Nelson then provided McFadden with treatment for a rash, which was the basis for the pre-existing sick call. Nurse Practitioner Nelson did not provide any treatment to McFadden for his nose. She stated she did not do so because she knew Dr. Dalmasi had already ordered the x-ray for examination of the injury.

The x-ray was taken on March 10, 2016, and on March 11, 2016, Dr. Dalmasi received and reviewed the radiologist's report which stated McFadden had a "comminuted nasal fracture." That same day, Dr. Dalmasi submitted a request for McFadden to be evaluated by an ear, nose, and throat specialist (ENT) outside of the FDC. This request required approval from the FDC's Utilization Review Committee (URC). Requests to the URC must be classified as emergent, urgent, or routine. Emergent means a patient will be taken to the emergency room immediately, while urgent means a patient should be seen in a fairly timely manner although there is no set timeframe. Dr. Dalmasi classified McFadden's request as urgent.

Dr. Dalmasi testified she did not believe McFadden's request was emergent because he did not appear to have any other symptoms. She stated, "[i]n order to have an emergency, he had to have more symptoms; hearing problem, speaking problem, a smelling problem, tingling, numbness in the face. Something that's telling me something bigger happen[ed] that day." Dalmasi Dep. 45:10–45:15. According to Dr. Dalmasi, the determination of whether a situation is an emergency is based on the circumstances of the case, including whether the injury or complaint is life-

---

[5] Nurse Practitioner Nelson testified she did not recall if McFadden reported any pain. *See* Nelson Dep. 37:9–37:13.

threatening. Dr. Dalmasi's medical opinion was that McFadden's situation was urgent. Her decision would not have changed even if Nurse Sogo's clinical encounter note stated McFadden was in pain.

On March 11, 2016, apart from Dr. Dalmasi's initiated treatment, another FDC nurse prescribed McFadden 600-mg ibuprofen due to his complaints of pain. On March 15, 2016, Nurse Practitioner Nelson renewed McFadden's ibuprofen and filed an administrative note to continue Motrin for pain, pending the outcome of the ENT consultation.

The URC approved Dr. Dalmasi's request for McFadden to be seen by an ENT specialist on March 15, 2016. Dr. Dalmasi had no control over the scheduling of the appointment. Although it could possibly take a month for a patient to see an outside doctor, Dr. Dalmasi testified she did not believe such a wait would have had a negative effect on McFadden's medical condition.

After the fight, McFadden remained in the SHU for approximately 40–50 days. During this period, Dr. Dalmasi made rounds in the SHU on Thursdays. Dr. Dalmasi saw McFadden on at least three occasions. Each time, she looked in on McFadden, listened to his complaints regarding difficulty breathing out of his nose and pain, and told him that he would be seen by a specialist. Due to security reasons, Dr. Dalmasi could not tell McFadden any details about when he would be seen. Dr. Dalmasi was not aware of any problems or delays on McFadden's request to see an outside ENT.

Nurse Sogo also conducted rounds in the SHU during this period on a regular basis. During these rounds, McFadden requested medical treatment from Nurse Sogo for his face and nose. Nurse Sogo told McFadden to "stop acting like a baby" and did not provide any medical treatment.

According to McFadden, on some occasions, Nurse Sogo would just ignore him. Other times, Nurse Sogo would suggest McFadden needed rest.[6]

Nurse Sogo stated he would see inmates in the SHU if they complained of any medical needs. If an inmate presented an "acute injury," Nurse Sogo would request to open the inmate's cell for an assessment by FDC medical staff. If an inmate complained of trouble breathing, and it appeared to be emergent, Nurse Sogo would have, at a minimum, taken the inmate's vitals. From this period, there is no evidence showing McFadden presented an acute injury nor is there any record of Nurse Sogo taking McFadden's vitals.

On March 23, 2016, while McFadden was waiting to be seen by an ENT specialist, Nurse Practitioner Nelson had a clinical encounter with McFadden. McFadden complained of pain in his wrist and nose, and stated his pain was at a subjective level of five on a scale of one to ten. Nurse Practitioner Nelson determined McFadden had a sprain in his wrist or hand and ordered an x-ray. Because Nurse Practitioner Nelson was aware McFadden was awaiting an appointment with an ENT specialist, she did not provide any treatment for his nose. On March 25, 2016, Nurse Practitioner Nelson renewed McFadden's ibuprofen prescription because she had previously overlooked the renewal at the March 23, 2016, clinical encounter.

Ultimately, McFadden was seen by an outside ENT, Dr. Busch, on April 12, 2016.[7] On his appointment paperwork, McFadden listed the following symptoms: headaches, blurred vision, runny nose, nosebleeds, asthma/wheezing, shortness of breath, frequent or recurring headaches,

---

[6] Nurse Sogo denies ignoring McFadden. *See* Sogo Dep. 86:5–88:16 (testifying he would have seen McFadden when conducting rounds).

[7] Although McFadden contends Dr. Busch did not have enough medical records to assess and treat him, Dr. Dalmasi does not have control over the process to send any inmates outside of the FDC. Further, Dr. Busch testified he would not have produced a different diagnosis even if he had more or different medical records.

lightheadedness and dizziness. By the time Dr. Busch met with McFadden, the nasal fracture had already healed. During his assessment, Dr. Busch found McFadden had a midline septum—meaning McFadden's septum was normal—along with nasal lining that was swollen, inflamed, and enlarged. Dr. Busch did not believe the nasal bones were obstructing McFadden's breathing. In his report, Dr. Busch diagnosed McFadden with non-allergic rhinitis, a chronic condition, which he believed caused McFadden's symptoms. Dr. Busch testified he did not believe McFadden's symptoms were caused by the injury from March 6, 2016, because the bones were healed by the time of his evaluation. Dr. Busch then recommended prescribing Flonase to treat McFadden's symptoms and noted that, if Flonase were unsuccessful, an oral decongestant could be added. Dr. Busch did not recommend surgery for McFadden's nose.

Although Dr. Busch saw McFadden on April 12, 2016, his report was not provided to the FDC for several weeks. Nurse Practitioner Nelson made efforts to obtain the report more promptly by emailing the FDC staff member responsible for communicating with IMS, the outside contractor that arranged the visit with Dr. Busch. IMS made several requests for the report, including faxing Dr. Busch's office on April 13, 2016, and April 18, 2016. But Dr. Dalmasi and Nurse Practitioner Nelson were not able to review Dr. Busch's report until May 6, 2016.

Both Dr. Dalmasi and Nurse Practitioner Nelson understood from Dr. Busch's report that McFadden did not have an obstruction from his nasal fracture and that his symptoms were instead caused by swelling and inflammation in his nose due to rhinitis. Dr. Dalmasi believed the recommended Flonase treatment would alleviate, although not eliminate, McFadden's symptoms. Dr. Dalmasi did not prescribe an oral decongestant because it is unavailable on the Bureau of Prisons formulary and because it provides the same relief as Flonase but with more adverse side effects. *See* Dalmasi Dep. 100:18–101:6. Had an oral decongestant been necessary, Dr. Dalmasi

could have requested it for an inmate. *Id.* 82:3–82:14. After McFadden began Flonase treatment, Dr. Dalmasi's personal involvement in McFadden's care was limited to co-signing a few clinical encounter notes, as discussed below.

Nurse Practitioner Nelson was familiar with Flonase and believed it would treat nasal inflammation. Nurse Practitioner Nelson met with McFadden on May 6, 2016, the same day she reviewed Dr. Busch's report, to explain the report to McFadden and prescribe Flonase as recommended. In her clinical encounter note, Nurse Practitioner Nelson reported McFadden disagreed with Dr. Busch's recommendation. McFadden received Flonase within 1–2 days of meeting with Nurse Practitioner Nelson.

On May 8, 2016, almost immediately after he started taking Flonase, McFadden complained the Flonase did not work. He made similar complaints on May 9, 2016, and May 18, 2016. From May 2016 until September 2016, when Nurse Practitioner Kistler began to take over McFadden's care, McFadden sent numerous emails complaining of the same symptoms: trouble breathing out of his nose, nosebleeds, headaches, and blurry vision. Although the emails were addressed to Nurse Practitioner Nelson, they were not sent to her directly, but were instead sent to the account for Health Services, the administrative health department at the FDC.[8] Nurse Practitioner Nelson would regularly see McFadden for his sick call requests and complaints during this period.

---

[8] The record contains at least 55 emails that McFadden sent to the Health Services account between April 2016 and September 2016, reporting the same symptoms described above and requesting to be seen by medical personnel. At oral argument, McFadden conceded these emails were sent to the wrong email address and that there was no evidence in the record establishing Nurse Practitioner Nelson actually received these emails. The Court need not discuss each email for these motions. There is no evidence Dr. Dalmasi or Nurse Sogo received or were otherwise aware of McFadden's emails, which were directed to Nurse Practitioner Nelson. Also, because McFadden does not challenge Defendants' conduct during this time, these emails are not particularly probative of the remaining claims in this case.

On May 20, 2016, McFadden had a follow-up clinical encounter with Nurse Practitioner Nelson. McFadden reported he could not breathe through his nose, had bleeding from the left side of his nose, and had blurry vision in the morning. Nurse Practitioner Nelson reported McFadden's pain as a subjective level of five and noted she prescribed "Flonase, Motrin" for intervention. Defs.' Ex. 31. Nurse Practitioner Nelson believed, in her medical judgment, McFadden was not using Flonase correctly. She thus re-educated him on the correct use and told him to continue using the medication. Dr. Dalmasi co-signed Nurse Practitioner Nelson's clinical encounter note the same day.

On May 29, 2016, Nurse Sogo had a clinical encounter with McFadden during which McFadden complained of "not being able to breathe." Defs.' Ex.34. In his clinical encounter note, Nurse Sogo stated McFadden's vital signs were unremarkable and his oxygen saturation results were normal, confirming that McFadden was getting enough oxygen. Nurse Sogo also reported McFadden did not complain of any pain. On May 31, 2016, Nurse Practitioner Nelson co-signed Nurse Sogo's clinical encounter. After the May 29, 2016, clinical encounter, Nurse Sogo had no other involvement in the treatment for McFadden's nose. *See* McFadden Dep. 259:11–259:15.

On July 5, 2016, Nurse Practitioner Nelson had a clinical encounter with McFadden, in which the chief complaint was bleeding from the nose. Nurse Practitioner Nelson informed McFadden that nosebleeds are a common side effect of using Flonase and suggested he stop using Flonase to see if the nosebleeds would stop. She also informed McFadden the FDC does not provide oral decongestants as alternatively prescribed by Dr. Busch. Because Nurse Practitioner

Nelson suggested the discontinuation of Flonase, the only treatment she recommended at this point was ibuprofen.[9]

Nurse Practitioner Nelson had another clinical encounter with McFadden on August 1, 2016, in which he complained of the same symptoms as in prior visits. She prescribed a seven-day supply of ibuprofen and advised McFadden to get ibuprofen from commissary from then on. Nurse Practitioner Nelson also noted that McFadden was aware no further treatment was recommended. Nurse Practitioner Nelson had additional clinical encounters with McFadden on August 22 and August 30, 2016, during which Nurse Practitioner Nelson assessed McFadden but prescribed no new treatment. Dr. Dalmasi co-signed Nurse Practitioner Nelson's clinical encounter notes for both visits. Dr. Dalmasi, at no point, changed McFadden's treatment plan, prescribed an oral decongestant, or sent McFadden to a different ENT specialist. Dr. Dalmasi testified she did not believe McFadden's continued symptoms warranted a change in treatment, because his symptoms were chronic. *See* Dalmasi Dep. 87:20–88:2; 88:24–89:9.

Nurse Practitioner Nelson did not have any further clinical encounters with McFadden until 2017, when she saw him on a few occasions. At one point, she re-prescribed Flonase and informed McFadden to drink plenty of water. Nurse Practitioner Nelson also prescribed cold pills and allergy medicine for related symptoms.

Based on the foregoing events, McFadden brought this suit alleging Eighth and Fifth Amendment claims against Defendants. He alleges Defendants failed to provide him with adequate medical care or denied or delayed treatment for his medical needs. Defendants each moved

---

[9] Although Nurse Practitioner Nelson recommended McFadden discontinue Flonase during this clinical encounter, the record is unclear as to when McFadden stopped using Flonase. At oral argument, however, the parties stated McFadden stopped the use of Flonase sometime in August 2016 and no further treatment was provided after that time.

separately for summary judgment. The Court heard oral argument on the motions on October 8, 2019. At oral argument, counsel for McFadden clarified his claims challenge only the denial or delay of treatment when Defendants (1) did not provide McFadden with ibuprofen in the first five days after his injury, (2) did not prescribe an oral decongestant after Flonase did not alleviate McFadden's symptoms, (3) did not seek a second opinion after Flonase did not alleviate McFadden's symptoms, and (4) did not provide any treatment once McFadden discontinued the use of Flonase. Counsel expressly stated McFadden was not challenging the adequacy of the care provided between March 11, 2016, when Dr. Dalmasi reviewed the x-ray of McFadden's nose, and sometime in August 2016, when McFadden discontinued the use of Flonase.

## DISCUSSION

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks

omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

This action is brought pursuant to *Bivens v. Six Unknown Named Agents*, in which the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). The implied cause of action is the "federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Id.* at 675–76. "A *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017). An individual officer can only be liable for his or her own unconstitutional conduct, and not for the unconstitutional conduct of subordinates under a theory of respondeat superior. *See id.*

McFadden alleges Defendants violated his Eighth and Fifth Amendment rights due to their conduct in providing, or not providing, medical care for his nose injury as a pretrial detainee. Because McFadden was a federal pretrial detainee at the time of the events in question, his claims are properly analyzed pursuant to the Due Process Clause of the Fifth Amendment. *See Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) (applying Due Process Clause to federal pretrial detainees' claims for inadequate medical care); *accord Montgomery v. Ray*, 145 F. App'x 738, 739 (3d Cir. 2005) ("The District Court correctly noted that a claim involving inadequate medical treatment of a federal pretrial detainee is analyzed pursuant to the Due Process Clause of the Fifth Amendment."); *cf. Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (noting the Eighth Amendment's prohibition against cruel and unusual punishment "applies only after [the Government] has secured a formal adjudication of guilty in accordance with due process of law" (internal quotation marks and citation omitted)).

The standard in the Third Circuit for evaluating a pretrial detainee's claim of inadequate medical treatment under the Due Process Clause is not entirely clear. Due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of convicted prisoners. *See Ray*, 145 F. App'x at 740. The Third Circuit has suggested the appropriate standard is "whether the conditions of confinement (or here, inadequate medical treatment) amounted to punishment prior to an adjudication of guilt." *Id.* (citations and internal quotation marks omitted). But the Third Circuit has also continued to evaluate medical care claims by pretrial detainees under the Eighth Amendment standard. *See Hubbard v. Taylor*, 399 F.3d 150, 166 n.22 ("[E]ven though the constitutional protections afforded [to] prisoners and pretrial detainees against inadequate medical care arise from [the prohibition on cruel and unusual punishment and due process, respectively], the standards governing the provision of medical care to each class are similar."). Nonetheless, the parties, in their briefing and during oral argument, have argued these motions pursuant to the Eighth Amendment standard and the Court applies that standard for the purposes of these motions.

Prison officials violate the Eighth Amendment when they act with deliberate indifference to a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). To sustain a constitutional claim under the Eighth Amendment for inadequate medical treatment, as McFadden alleges here, a plaintiff must make (1) an objective showing that his medical needs were serious and (2) a subjective showing that the defendants were deliberately indifferent to those medical needs. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987) (citation omitted). A prison official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate

health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference can be established in different ways depending on the claim a plaintiff alleges. *See Pearson*, 850 F.3d at 538.

In this case, the standard for deliberate indifference depends on whether McFadden's claims challenge (1) the denial or delay of medical care for non-medical reasons or (2) the adequacy of the care provided.

For adequacy of care claims, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Id.* Further, a prisoner's disagreement with the treatment provided does not support a claim under the Eighth Amendment. *See id.* ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990))). To establish deliberate indifference for an adequacy of care claim, a plaintiff must make an objective showing of inadequate medical treatment, and a subjective showing of the defendant's state of mind as "deliberately indifferent." *See id.* at 536. The objective showing may require expert testimony where laymen would not be able to determine whether treatment or a diagnosis fell below professional standards of care. *See id.* Expert testimony is not necessary when other extrinsic proof may suffice to show the quality of medical care fell below professional standards. *See id.*

On the other hand, for a denial or delay of care claim, the deliberate indifference prong involves only a subjective inquiry. *See id.* at 537. "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the denial or delay was motivated by non-medical factors." *Id.* Additional extrinsic proof is thus unnecessary for a plaintiff

to survive summary judgment on a denial or delay of care claim. *See id.* (holding a plaintiff's testimony that a nurse forced him to crawl to a wheelchair while he screamed in pain for hours and was unable to walk was sufficient to create a triable issue as to whether the nurse knew the plaintiff could not walk and deliberately failed to assist him for non-medical reasons).

In their motions, Defendants characterize McFadden's claims as adequacy of care claims and argue he has failed to produce sufficient extrinsic evidence—mainly expert testimony—to establish the medical care he received was inadequate under the objective prong of the deliberate indifference standard. In response, McFadden characterizes his claims as denial or delay of treatment claims. *See* Pl.'s Resp. 1. At oral argument, counsel for McFadden clarified McFadden does not challenge the adequacy of care Defendants provided between March 11, 2016, when Dr. Dalmasi reviewed the x-ray of his nose, and sometime in August 2016, at which time McFadden stopped taking Flonase.[10] Rather, McFadden argues he was denied or delayed treatment when Defendants (1) did not provide him with ibuprofen in the first five days after his injury, (2) did not prescribe an oral decongestant after Flonase did not alleviate his symptoms, (3) did not seek a second opinion after Flonase did not alleviate his symptoms, and (4) did not provide him with any treatment after August 2016, when he stopped using Flonase.

## I.     Failure to Prescribe Ibuprofen March 6, 2016 – March 11, 2016

On his claim of being denied treatment within the first five days of his injury, McFadden has not produced evidence from which a reasonable jury could find either (1) a serious medical

---

[10] Counsel stated the care provided during this period falls into the category of "adequacy of care," requiring a two-pronged showing of deliberate indifference, pursuant to *Pearson*. Counsel conceded to establish deliberate indifference, expert testimony or other extrinsic evidence would be required because it would not be obvious to a layperson whether the failure to institute other treatment or a failure to diagnose during this time fell below professional standards. McFadden has not produced any expert or extrinsic evidence. Although oral argument was not transcribed, this discussion happens between 9:23 a.m. and 9:27 a.m. on the audio recording.

need, or (2) deliberate indifference by any of the Defendants. As a result, each of the Defendants is entitled to summary judgment on this claim.

As for the serious medical need prong, McFadden's broken nose, alone, does not qualify as a serious medical need. On the day he sustained the broken nose, McFadden complained of pain but did not complain of any other symptoms such as difficulty breathing or headaches. There is no evidence in the record that on the day of the injury McFadden suffered from any injury or symptoms other than the broken nose and associated pain. Defendants submitted a photo of McFadden taken during his clinical encounter with Nurse Sogo, which shows swelling around McFadden's nose. *See* Defs.' Ex. 9. Defendants also produced a video of McFadden immediately after the fight in which he uses a sock to rub pepper spray off his face. *See* Defs.' Ex. 1A (filed under seal). McFadden appears to wipe his face thoroughly and vigorously and did not express any indication of pain, difficulty breathing, or bleeding. *See id.* McFadden testified he reported pain and difficulty breathing to Nurse Practitioner Nelson the day after the injury. These symptoms appear to be related to the broken nose.

On this record, medical expert evidence is necessary to establish the seriousness of McFadden's injury because the seriousness would not be apparent to a layperson.[11] *See Williams v. Guard Bryant Fields*, 535 F. App'x 205, 212 (3d Cir. 2013) ("[A] broken nose and facial lacerations—while perhaps painful, are arguably no more serious than the nerve injury suffered in

---

[11] After oral argument, McFadden filed a supplemental exhibit which includes an October 10, 2017, clinical encounter note from Nurse Practitioner Kistler, in which she noted McFadden had a deviated septum. *See* Pl.'s Ex. 110, ECF No. 72-1. McFadden argues the serious medical need extends beyond the broken nose and includes McFadden's other symptoms and his deviated septum. But a post hoc diagnosis, made over a year after the injury at issue in this case cannot establish that McFadden had an objectively serious medical need within the first five days of his injury. *See Mattern v. City of Sea Isle*, 657 F. App'x 134, 139 (3d Cir. 2016) (stating post hoc diagnosis is insufficient to establish a serious medical need).

*Boring*, which we held required expert testimony to establish its seriousness." (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir. 1987)). Because McFadden has not submitted such evidence, a reasonable jury could not find McFadden suffered from an objectively serious medical need from which the need for treatment was acute. *See Boring*, 833 F.2d at 473 (stating where surgery for a condition is elective, "the need for treatment does not appear to be one that [is] acute"). As a result, Defendants are entitled to summary judgment.

Even assuming McFadden's broken nose was a serious medical need, McFadden has still failed to produce evidence from which a reasonable jury could find deliberate indifference on behalf of any of the Defendants. As noted, the standard for establishing deliberate indifference depends on whether McFadden asserts a denial or delay of treatment claim or an adequacy of care claim. But the Court is not bound by McFadden's characterization of his claims. *See Pearson*, 850 F.3d at 538 (stating where a plaintiff characterizes his claims as denial or delay of medical care, and a defendant undisputedly examined, diagnosed, and made decisions regarding the plaintiff's care, the claim is properly characterized as an adequacy of care claim).

As for Nurse Sogo, there is no dispute he saw and treated McFadden the day of his injury and in the following days while McFadden was in the SHU. Further, there is nothing in the record to suggest Nurse Sogo did not offer a different treatment for non-medical reasons. *See Pearson*, 850 F.3d at 537 (noting a finding of deliberate indifference in cases where medical treatment is delayed for non-medical reasons). As a result, the Court construes McFadden's claim that Nurse Sogo did not provide ibuprofen in the first five days following McFadden's injury or did not provide different treatment—such as referring McFadden to the hospital for emergency care[12]—is

_____

[12] Although McFadden's claim during this period is focused on the denial of ibuprofen, in his brief he argues Nurse Sogo "did nothing to treat McFadden's broken nose." *See* Pl.'s Resp. 9. At oral

an adequacy of care claim. To establish deliberate indifference, McFadden thus has the burden to make an objective showing that Nurse Sogo's treatment fell below professional standards of care and a subjective showing that Nurse Sogo subjectively appreciated the true seriousness of the risk of harm. *See Pearson*, 850 F.3d at 539.

The record shows Nurse Sogo saw McFadden within an hour after the fight, cleaned his abrasions with iodine, and determined that no other treatment was necessary at that time. Nurse Sogo then contacted the on-call FDC physician, as required by protocol, and completed a clinical encounter note. Nurse Sogo knew an FDC physician would follow up and determine the relevant treatment necessary. Although McFadden claims he told Nurse Sogo he was in pain, there is no evidence McFadden asked Nurse Sogo for pain medication and was refused. The record does establish, however, Nurse Sogo had no ability to prescribe medication, even ibuprofen, to inmates.

Based on adequacy of care, Nurse Sogo is entitled to summary judgment because there is no evidence in the record from which a reasonable jury could find the care Nurse Sogo provided violated professional standards of care. Defendants have proffered the expert opinion of Dr. John Kirby who stated, "Nothing during the week of March 6–March 11 would indicate to a primary care provider that Mr. McFadden required hospitalization or immediate emergency room evaluation for [a] potential nasal fracture." Defs.' Ex. 44, at 12. McFadden has failed to proffer any extrinsic evidence—whether expert opinions or otherwise—to refute the presumption that Nurse Sogo's medical treatment during his encounter with McFadden on March 6, 2019, was adequate. In fact, the record establishes Nurse Sogo met the required standards for treating McFadden on that date.

---

argument, counsel also argued Nurse Sogo "should have done more" during the initial clinical encounter on March 16, 2016.

To the extent McFadden asserts Nurse Sogo's failure to prescribe ibuprofen during the clinical encounter was deliberately indifferent, there is no dispute Nurse Sogo did not have the authority to prescribe ibuprofen and McFadden did not specifically ask for ibuprofen. *See* Sogo Dep. 36:12–36:21. On this record, there is no genuine dispute of material fact regarding whether Nurse Sogo acted with deliberate indifference to McFadden's allegedly serious medical need. On the claim against Nurse Sogo for his failure to prescribe ibuprofen in the first five days of McFadden's injury, the Court will grant summary judgment in Nurse Sogo's favor. *Cf. McGinnis v. Hammer*, 751 F. App'x 287, 290 (3d Cir. 2018) (dismissing claim for the denial of alternative pain medication where plaintiff did not allege he asked for the pain medication or that the defendant had retaliatory motives in denying the medication).[13]

As with Nurse Sogo, there is no dispute Dr. Dalmasi provided treatment to McFadden in the first five days after his injury. Although Dr. Dalmasi did not examine McFadden during this period, she reviewed McFadden's medical records and initiated a treatment plan for his nose injury. Despite McFadden's characterization of his claim against Dr. Dalmasi as a denial or delay of care claim, this claim is more properly characterized as an adequacy of care claim. Again,

---

[13] McFadden also argues in his response that Nurse Sogo's failure to provide ice during the evening of March 6, 2019, establishes deliberate indifference. The record does not support a finding of deliberate indifference. The record does not establish Nurse Sogo intentionally refused to bring ice for the "unnecessary and wanton infliction of pain" or for a non-medical reason. *White v. Napoleon*, 897 F.2d 103, 108–09 (3d Cir. 1990). Rather, the record shows Nurse Sogo was the only medical personnel at the FDC on March 6, 2016. Nurse Sogo was responsible for providing "triage" treatment to the four inmates involved in the fight and at least one prison guard who was sprayed with pepper spray during the fight. Even assuming McFadden asked for ice, Nurse Sogo's failure to provide it is, at worst, negligent. *See Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). These facts, viewed in the light most favorable to McFadden, could not lead a reasonable jury to find Nurse Sogo acted with deliberate indifference to McFadden's serious medical need by failing to produce ice.

McFadden must adduce evidence from which a reasonable jury could find Dr. Dalmasi's medical care fell below professional standards of care and that she acted with the requisite subjective state of mind. McFadden has failed to create a dispute as to either prong of deliberate indifference for his claim against Dr. Dalmasi.

Within the first five days of McFadden's injury, Dr. Dalmasi reviewed Nurse Sogo's clinical encounter note, ordered an x-ray of McFadden's nose, reviewed the radiologist's findings, and requested an appointment for McFadden to see an ENT specialist. At no point did Dr. Dalmasi have in-person contact with McFadden during this period. *See* Dalmasi Dep. 41:7–41:11; 46:18–46:21. Rather, the record shows she formulated a treatment plan based on her review of McFadden's medical records including Nurse Sogo's clinical note, which reported McFadden denied pain. Although McFadden testified he began to experience other symptoms the day after his injury, there is no evidence Dr. Dalmasi knew of those symptoms. *See* Pl.'s Ex. 13, 15 (Dr. Dalmasi's review of Nurse Sogo's clinical encounter noting McFadden denied pain).

Nor is there any evidence Dr. Dalmasi acted intentionally to deny McFadden ibuprofen, or informed other medical personnel to refuse to give McFadden ibuprofen. On this record, a reasonable jury could not find Dr. Dalmasi acted with deliberate indifference. *See Lanzaro*, 834 F.2d at 346 (stating to establish deliberate indifference "knowledge of the need for medical care" must be accompanied by the intentional refusal to provide that care). Similarly, on the objective prong, there is no evidence in the record establishing Dr. Dalmasi's failure to prescribe ibuprofen for McFadden, who, to her knowledge, denied pain, fell below professional standards of care.

Therefore, the Court will grant summary judgment for Dr. Dalmasi on McFadden's claim against her for denying him ibuprofen for the first five days after his injury.[14]

Addressing Nurse Practitioner Nelson, McFadden has failed to meet his burden to create a triable issue as to whether she acted with deliberate indifference within the first five days of his injury by not prescribing him ibuprofen. There is no dispute Nurse Practitioner Nelson met with McFadden the day after his injury and did not prescribe him ibuprofen. Nevertheless, under either standard—denial or delay of treatment or adequacy of care—Nurse Practitioner Nelson knew McFadden was already being treated by Dr. Dalmasi and thus will not be charged with deliberate indifference. *See Pearson*, 850 F.3d at 540 n.4 (stating "non-medical prison official will not be chargeable with deliberate indifference" if prison doctors are already treating a prisoner and extending application to non-physician medical personnel).

The record shows Nurse Practitioner Nelson saw McFadden for a pre-existing skin rash the day after his injury. At that time, McFadden reported pain and difficulty breathing due to his nose injury. Although Nurse Practitioner Nelson only provided McFadden treatment for his pre-existing rash, she knew Nurse Sogo had treated McFadden immediately following the injury and

_____

[14] In his response to Dr. Dalmasi's motion, McFadden argues Dr. Dalmasi was deliberately indifferent because she classified the ENT specialist request as "urgent" rather than "emergent," delaying the time McFadden would be seen by a specialist. McFadden characterizes this claim as one for denial or delay of treatment. *See* Pl.'s Mem. in Opp'n 10. Because Dr. Dalmasi reviewed McFadden's files and actually recommended a treatment plan, however, the Court finds this claim to be a challenge to the adequacy of Dr. Dalmasi's care. *See Pearson*, 850 F.3d at 538. As McFadden's counsel conceded at oral argument, the decision as to how quickly McFadden needed to see an ENT specialist was within Dr. Dalmasi's medical judgment. To the extent McFadden challenges this decision, extrinsic evidence—though not necessarily expert evidence—is required to establish that the decision fell below professional standards of care. *See Pearson*, 850 F.3d at 539 (stating extrinsic evidence was necessary to show defendant's decision "regarding the symptoms of which she had awareness was a substantial departure from accepted professional judgment, practice, or standards such that a reasonable jury could conclude that she actually did not base her decision on such judgment"). As there is no such evidence in the record, Dr. Dalmasi is entitled to summary judgment on this claim as well.

that McFadden was also under the care of Dr. Dalmasi who had ordered an x-ray. *See* Nelson Dep. 36:21–37:2. In these circumstances, Nurse Practitioner Nelson was entitled to rely on Dr. Dalmasi's initiated treatment of McFadden's nose injury. *See Pearson*, 850 F.3d at 540 n.4 ("Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' so long as the nurse has no discernable basis to question the physician's medical judgment."). McFadden has not produced any evidence to show Nurse Practitioner Nelson had reason to question Dr. Dalmasi's medical judgment. In fact, Defendants' expert, Dr. Kirby, instead opined Dr. Dalmasi acted reasonably to address McFadden's needs within the first five days of his injury. *See* Defs.' Ex. 44, at 12.

The circumstances surrounding Nurse Practitioner Nelson's failure to prescribe ibuprofen also do not provide a basis on which a reasonable jury could find she acted with deliberate indifference or was motivated by non-medical reasons—as required for a denial or delay of care claim. Although McFadden testified he communicated his pain to Nurse Practitioner Nelson during the clinical encounter, at best, this serves to show she failed to appreciate the need for treatment beyond what Dr. Dalmasi had already initiated.[15] Absent evidence establishing the seriousness of McFadden's pain or nose injury, a reasonable jury could not conclude Nurse Practitioner Nelson was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed" and that she actually drew that inference. *See Farmer*, 511 U.S. at 837. On the contrary,

---

[15] At oral argument, counsel for McFadden repeatedly argued McFadden *requested* ibuprofen from Nurse Practitioner Nelson and she refused to provide it. Upon review of the record, however, there is no evidence, not even in McFadden's own deposition, showing McFadden requested ibuprofen and was refused. *See* McFadden Dep. 90:9–92:8 (describing March 7, 2016, encounter with Nurse Practitioner Nelson). Further, there is no evidence McFadden told Nurse Practitioner Nelson he had not yet been prescribed ibuprofen, which might suggest she knew he was without ibuprofen and her failure to provide it was an outright denial of treatment.

as noted, the surrounding circumstances suggest Nurse Practitioner Nelson was justified in believing McFadden was already being treated for his nose injury and no other treatment was necessary at that time. *See Pearson*, 850 F.3d at 540 (finding defendant-nurse was justified in believing inmate "was not in danger absent instructions from [the doctor and surgeon]" that his needs should be treated differently). As a result, the Court will grant summary judgment for Nurse Practitioner Nelson on this claim.

## II.    Denial of Oral Decongestant

McFadden next argues Defendants were deliberately indifferent because they refused to prescribe an oral decongestant as Dr. Busch recommended if Flonase was ineffective. On this claim, McFadden has failed to meet his burden regarding any of the Defendants' deliberate indifference.[16]

To the extent McFadden is pursuing this claim against Nurse Sogo, there is no evidence showing Nurse Sogo had any involvement in or any control over which medications were selected to treat McFadden's conditions. Nurse Sogo testified each of his clinical encounters was subject to review and follow-up by an FDC physician. The record shows he has no control over whether a patient receives a certain diagnosis or treatment. *See* Sogo Dep. 32:10 ("I cannot diagnose."); *id.* 32:13–32:15 ("I can refer that person to a physician to diagnose it. But within the scope of my practice, I don't diagnose."); *id.* 34:12–34:14 ("Treatment plan isn't working. That's beyond the scope of [my] practice as far as I know."). There is nothing in the record to dispute this fact.

---

[16] Although the Court need not address whether McFadden suffered from a serious medical need to grant Defendants' motions on the remaining claims, the Court assumes McFadden's broken nose, combined with his other symptoms, was a serious medical need after March 11, 2016. *See Young v. Kazmerski*, 266 F. App'x 191, 193–94 (3d Cir. 2008) (finding sufficient evidence of serious medical need when plaintiff complained of, and defendants were aware of, pain, difficulty eating, and difficulty sleeping for five months).

Moreover, after this initial encounter with McFadden on March 6, 2016, Nurse Sogo's contact with McFadden was limited to seeing him while conducting rounds in the SHU for 40–50 days after March 6 and a single clinical encounter on May 29, 2016. During these contacts, McFadden was receiving treatment from the FDC physicians as part of the follow up procedures at the FDC. *See* Sogo Dep. 59:13–59:18 ("By default I did [schedule a follow-up examination]. By sending that note up the chain."). Therefore, in his assessments of McFadden after March 6, 2016, Nurse Sogo was justified in relying on the FDC physicians' treatment absent a reason to question their medical judgment and will not be charged with deliberate indifference. *See Pearson*, 850 F.3d at 540 n.4. In any event, because Defendants were not aware of Dr. Busch's recommended treatment—including the possible use of an oral decongestant—until May 6, 2016, Nurse Sogo cannot have been deliberately indifferent in failing to provide the oral decongestant to McFadden during his rounds, which ended before May 6, 2016.

Nor has McFadden shown Nurse Sogo was otherwise deliberately indifferent to his medical needs while he was in the SHU.[17] Nurse Sogo testified his rounds were used to assess inmates for "acute injuries." Sogo Dep. 29:14–30:12. Acute injuries would include bleeding, chest pain, being unable to breathe, cuts, or instances when an inmate is "doubled-over and looking as if he were about to die." *Id.* Unless an inmate exhibited an acute injury, Nurse Sogo did not conduct a clinical encounter or recommend other FDC medical personnel conduct a clinical encounter. Considering Nurse Sogo complied with this procedure, and there is no evidence this procedure or that Nurse Sogo's failure to identify McFadden with an acute injury fell below objective professional standards of care, McFadden has failed to create a dispute regarding the objective requirement for

---

[17] McFadden's narrowed claims do not challenge this conduct, but in his brief, McFadden argues Nurse Sogo's conduct during his rounds were deliberately indifferent.

deliberate indifference. As a result, Nurse Sogo is entitled to summary judgment on this claim, and the Court will grant his motion.

Turning to Dr. Dalmasi, McFadden argues her decision not to prescribe the oral decongestant was for non-medical reasons amounting to deliberate indifference under *White v. Napoleon*, 897 F.2d 103 (3d Cir. 1990). In *White*, a case decided at the motion to dismiss stage, the Third Circuit held allegations that a doctor intentionally prescribed treatment to place a plaintiff at a substantially increased risk of a peptic ulcer are sufficient to survive a motion to dismiss. *See id.* at 109. Allegations that a doctor maliciously left the plaintiff with Debrox in his ear for forty minutes for the non-medical purpose of causing the plaintiff pain are also held sufficient to survive a motion to dismiss. *See id.* Another plaintiff in this case alleged the defendant doctor did not prescribe the only treatment that was effective and instead prescribed treatment that had failed in the past and only served to inflict pain. *See id.* at 110. Based on this allegation, the Third Circuit held a plaintiff may establish deliberate indifference by showing a doctor persisted in a course of treatment "in the face of resultant pain and risk of permanent injury." *See id.* at 109–10. The doctor would not be liable, however, if he pursued a treatment because he believed, in his judgment, the plaintiff would benefit from the treatment. *See id.* at 110–11. The Third Circuit also recognized, that although such allegations were sufficient to survive the motion to dismiss stage, the plaintiffs may have insufficient evidence to show the doctor *intended* to inflict pain or was deliberately indifferent to their medical needs. *See id.* at 109. Such evidence is lacking here.

Contrary to McFadden's assertion that Dr. Dalmasi denied the oral decongestant intentionally to inflict pain, Dr. Dalmasi testified she did not prescribe the oral decongestant because she believed it would provide the same relief as Flonase but with more side effects. Dr. Dalmasi has thus proffered evidence of a medical reason for implementing and continuing the

Flonase treatment. Although it is possible her decision to continue Flonase without adding an oral decongestant may have been negligent, there is no evidence showing she knew or intended the treatment to cause McFadden pain or to jeopardize his future health. Dr. Dalmasi's conduct is in stark contrast to that of the defendant in *White* who allegedly left Debrox in the plaintiff's ear for forty minutes for the non-medical purpose of intentionally inflicting pain. *See White*, 897 F.2d at 109.

McFadden has also not produced any contrary evidence showing Dr. Dalmasi's decision was instead based on non-medical reasons. At the summary judgment stage, McFadden bears the burden to produce affirmative proof establishing a genuine dispute of material fact as to whether Dr. Dalmasi acted intentionally to cause him pain. *See Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment.").

Also, under the *White* standard, McFadden has failed to adduce evidence showing Dr. Dalmasi continued to prescribe only Flonase despite a risk of permanent injury. McFadden's diagnosed condition, non-allergic rhinitis, is a chronic condition. Throughout his use of Flonase, McFadden reported only that his symptoms were not alleviated and that he continued to be in pain. McFadden, however, has not produced any medical diagnosis, expert opinion, or extrinsic evidence showing his use of Flonase put him at risk of permanent injury beyond continuing to suffer from the chronic condition for which treatment had been prescribed. In his most recent assessment, McFadden was diagnosed with a minor or slight septal deviation and allergic or non-allergic rhinitis. *See* Defs.' Ex. 43, at 3. But Defendants' expert reports state the septal deviation does not contribute to McFadden's claimed symptoms, which are instead caused by rhinitis and are the same symptoms from which he has suffered since the beginning of his complaints. *See*

Defs.' Ex. 43, at 3; Defs.' Ex. 44, at 16–19. According to Defendants' experts, these symptoms are treatable by Flonase. *See* Defs.' Ex. 43, at 3–4; Defs.' Ex. 44, at 16. Defendants' expert reports establishe the side effects from Flonase include nosebleeds, which McFadden regularly reported experiencing. This evidence is insufficient to establish the continuation of Flonase posed a risk of substantial or permanent injury.

In any event, this claim is more properly characterized as an adequacy of care claim. First, it is undisputed Dr. Dalmasi saw McFadden each time he requested, reviewed his medical records, and implemented Flonase as recommended by Dr. Busch. Second, at oral argument, counsel for McFadden conceded Dr. Dalmasi's treatment decisions were within her medical judgment. McFadden is thus required to show not only Dr. Dalmasi's subjective state of mind was deliberately indifferent but also that her treatment decision fell below objective standards of care. McFadden has not met his burden.

As for the objective prong, the record includes no evidence that Dr. Dalmasi's decision to not prescribe the oral decongestant fell below professional standards of care. In fact, counsel for McFadden conceded there is no evidence showing an oral decongestant would have worked differently or better than Flonase or that it was medically necessary—which might suggest the failure to prescribe the oral decongestant fell below professional standards of care. McFadden instead relies on Defendants' expert report from Dr. Rasesh Shaw stating "[o]ral decongestants would also be an option, but not necessarily the only option." *See* Defs.' Ex. 43, at 3. This expert report, however, serves to establish Dr. Dalmasi had options for treatment[18] and her decision to

---

[18] In his response to the summary judgment motions, McFadden asserts he should have also received surgery to correct his broken nose. At oral argument, counsel for McFadden argued the various treatment options should have been treated like a "checklist" to cycle through until an effective treatment is found, i.e., first prescribing Flonase, then prescribing an oral decongestant, and as a last resort, recommending surgery. McFadden has produced no evidence to show surgery

prescribe only Flonase was reasonable. In this adequacy of care claim, expert testimony or other extrinsic evidence[19] is necessary to show the decision to continue to prescribe Flonase was inadequate. *See Pearson*, 850 F.3d at 536 ("[E]xtrinsic evidence is needed to create a triable issue on [plaintiff's] adequacy of treatment claims where it would not be obvious to a layperson that the defendant breached a professional standard of care."). McFadden, however, has failed to produce any such extrinsic evidence, and Dr. Dalmasi is entitled to summary judgment on this claim. *See id.* at 542 (affirming summary judgment for doctor who provided treatment and plaintiff failed to produce "extrinsic evidence that would permit a lay person to conclude that [the doctor's] actions constituted 'a substantial departure from accepted professional judgment, practice, or standards'" (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

---

was medically necessary to alleviate his symptoms. In fact, the record establishes surgery was *not* necessary and would only address cosmetic concerns. Nor has McFadden produced evidence showing that the failure to implement each treatment on the "checklist" fell below professional standards of care.

[19] At oral argument, counsel for McFadden noted expert testimony is not always necessary to establish deliberate indifference under *Pearson*, but only sufficient extrinsic evidence. But McFadden has not pointed to any other extrinsic proof establishing deliberate indifference apart from his own personal statements of pain and subjective beliefs regarding Flonase's effectiveness. *See* Pl.'s Mem. in Opp'n 11. While the Third Circuit has not ruled on this issue, courts within the Third Circuit have held a plaintiff's subjective beliefs and self-diagnosis are insufficient to create a dispute of material fact. *See, e.g.*, *Sims v. Piazza*, No. 09-0033, 2011 WL 3664469, at *9, *12 (M.D. Pa. Jan. 31, 2011) (finding plaintiff's numerous complaints and own conclusions without medical evidence were insufficient to establish deliberate indifference); *cf. McKinney v. Hemsley*, No. 14-3564, 2019 WL 1293719, at *12 (D.N.J. Mar. 20, 2019) (citing *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994)). This Court agrees.

In any event, in *Pearson*, the Third Circuit affirmed summary judgment where expert testimony was not necessary, but the plaintiff had failed to produce additional extrinsic proof such as a training manual, photographs, and medical records from which a layperson could find the defendant breached a professional standard of care. 850 F.3d at 537–38. The Court finds likewise in this case; in the absence of extrinsic evidence—expert testimony or otherwise—there is no triable issue on McFadden's adequacy of care claim.

Turning to Nurse Practitioner Nelson, there is no dispute she regularly saw McFadden at his request while he was using Flonase. During these encounters, Nurse Practitioner Nelson listened to his complaints, assessed him and provided him with treatment including re-prescribing Flonase, educating him on medication use and methods to alleviate his symptoms, and prescribing ibuprofen for his pain. Despite McFadden's argument that he is pursuing a denial or delay of treatment claim, this claim is more appropriately characterized as an adequacy of care claim. McFadden must make the objective showing that Nurse Practitioner Nelson's conduct fell below professional standards of care and the subjective showing that she acted with the requisite state of mind. McFadden has not met his burden on either showing.

Nurse Practitioner Nelson had several contacts with McFadden during his use of Flonase. McFadden consistently reported his symptoms had not subsided, he was in pain, and the Flonase was not working. Nurse Practitioner Nelson, however, testified she believed McFadden was not using the Flonase correctly. At one point, she re-educated McFadden on how to properly use Flonase and reminded him to avoid putting anything up his nose. Although Nurse Practitioner Nelson did not prescribe any different treatment, it is undisputed she saw McFadden in response to his requests, listened to his complaints, and provided treatment based on her medical judgment. In most of her clinical encounters, Nurse Practitioner Nelson also prescribed McFadden ibuprofen to address his complaints of pain and headaches.

As to the objective showing, McFadden has not produced evidence suggesting the failure to prescribe the oral decongestant fell below professional standards of care. As with the claim against Dr. Dalmasi, extrinsic evidence establishing Nurse Practitioner Nelson's care violated professional standards is necessary because the violation would not be apparent to a layperson. *See Pearson*, 850 F.3d at 536. Because McFadden has failed to provide any extrinsic evidence to this

effect, he is unable to meet his burden as to the objective component of Nurse Practitioner Nelson's deliberate indifference.

Also, without evidence showing Nurse Practitioner Nelson's continuation of Flonase was objectively inadequate, McFadden's complaints are based on his disagreement with the treatment plan recommended by Dr. Busch and implemented by Nurse Practitioner Nelson. McFadden's disagreement, however, is insufficient to create a triable issue on whether Nurse Practitioner Nelson acted with deliberate indifference to his allegedly serious medical needs. *See Pearson*, 850 F.3d at 543 (stating prisoner's complaint that he should have received more treatment was "mere disagreement" which does not support claim under the Eighth Amendment (citing *Lanzaro*, 834 F.2d at 346)). Although McFadden also disagreed with Nurse Practitioner Nelson's advice to stop using Flonase to see if his nosebleeds would stop, this again was within her medical judgment. McFadden consistently complained of nosebleeds. Nurse Practitioner Nelson knew, as expert reports show, nosebleeds are a common side effect of Flonase. To determine whether Flonase was in fact the cause of McFadden's nosebleeds, Nurse Practitioner Nelson advised him to stop the medication for a while. This conduct does not show subjective deliberate indifference but instead shows Nurse Practitioner Nelson attempted to address McFadden's concern with his nosebleeds in light of his prescribed treatment. Because McFadden's dissatisfaction with Nurse Practitioner Nelson's treatment plan and advice falls short of deliberate indifference, Nurse Practitioner Nelson is entitled to summary judgment on this claim. *See Boring*, 833 F.2d at 473 ("[C]ourts will not 'second-guess the propriety or adequacy of a particular course of treatment which remains a question of sound professional judgment.'" (citing *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979))).

### III.    Denial of McFadden's Request for a Second Opinion

McFadden next argues Defendants were deliberately indifferent because they failed to refer him to a different ENT specialist for a second opinion after the Flonase proved unsuccessful at treating his symptoms. On this claim, too, McFadden has failed to produce evidence from which a reasonable jury could find any of the Defendants was deliberately indifferent.

As an initial matter, McFadden is not entitled to a second opinion even if he subsequently disagreed with the recommended treatment. *See Youmans v. City of New York*, 14 F. Supp. 3d 355, 363–65 (S.D.N.Y. 2014) ("[F]ailure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights."); *see also Bailey v. Aramark Corp.*, No. 16-165, 2018 WL 2072865, at *7 (W.D. Ky. May 3, 2018) ("As long as the treatment actually afforded an inmate squares with constitutional standards, he has no right to demand second opinions, a certain physician, or a particular treatment." (citing *Colvin v. Burns*, No. 08-276, 2010 WL 1963289, at *2 (E.D. Tenn. May 13, 2010))).

As to Nurse Sogo, there is no evidence he had any role in deciding whether McFadden saw another ENT specialist for a second opinion. Indeed, there is no evidence he had any interaction with McFadden beyond May 29, 2016. Nurse Sogo is therefore entitled to summary judgment on this claim and the Court will grant his motion. *See Ziglar*, 137 S. Ct. at 1860 ("[A] *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others.").

As for Dr. Dalmasi, because she actually treated McFadden based on Dr. Busch's diagnosis and recommendation, McFadden's claims that she did not provide him with a second opinion, is, in essence, a challenge to the adequacy of Dr. Dalmasi's care. McFadden must make an objective showing that Dr. Dalmasi's failure to seek a second opinion fell below professional standards of

care and a showing regarding her subjective state of mind as deliberately indifferent. McFadden has failed to meet his burden on either prong.

The record establishes McFadden's condition is chronic. Dr. Dalmasi understood Flonase would help alleviate, but not eliminate, McFadden's symptoms. *See* Dalmasi Dep. 89:4–89:9. The symptoms he continued to complain of were the same symptoms that Dr. Busch, an ENT specialist, assessed and for which he recommended Flonase. Dr. Dalmasi testified that although McFadden described his symptoms as worsening, upon review of his chart, she did not "see [anything] relevant that he [brought] to my attention that any further treatment [needed] to be performed." *Id.* 120:25–121:11. Absent expert testimony or other extrinsic evidence, a jury would not be able to determine whether the failure to obtain a second opinion in these circumstances fell below a professional standard of care. Because McFadden has not presented any such evidence, he has failed to establish the objective prong of deliberate indifference.

As for the subjective prong, the Court finds no evidence in the record showing McFadden specifically requested a second opinion on his nose from Dr. Dalmasi, despite McFadden's argument to the contrary. On August 1, 2016, McFadden sent an email to the Health Services account directed to other FDC personnel, and requested to be seen by another outside specialist. Pl.'s Ex. 90. He emailed identical requests to Health Services on August 5 and August 15, 2016. In response, Health Services directed McFadden to submit sick call requests to address his concerns. Although McFadden requested a second opinion from Health Services, there is no evidence showing Dr. Dalmasi knew of his requests. Because this is a *Bivens* action, McFadden's claims must address Dr. Dalmasi's specific conduct and state of mind. *See Ziglar*, 137 S. Ct. at 1860 ("[A] *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others."). Based on this record, there is no evidence Dr. Dalmasi received McFadden's

complaints, denied them, and did so with subjective deliberate indifference. Dr. Dalmasi cannot be liable for the acts and knowledge of other FDC personnel who received McFadden's emails and declined to provide him with a second opinion. Therefore, Dr. Dalmasi is entitled to summary judgment on McFadden's claim that she was deliberately indifferent to his requests for a second opinion.

As for Nurse Practitioner Nelson, she is entitled to summary judgment for the same reasons as Dr. Dalmasi. The record shows she regularly met with McFadden as he requested. She addressed his concerns and believed in her medical judgment he did not need to be sent to another specialist. *See* Nelson Dep. 100:11–101:8. To the extent McFadden disagreed with Dr. Busch's recommendation, Nurse Practitioner Nelson noted his dissatisfaction in her clinical encounter notes. *See* Defs.' Ex. 30. The mere disagreement with treatment, however, does not establish a constitutional violation. *See Spruill*, 372 F.3d at 235.

Although McFadden was dissatisfied, there is no evidence showing Nurse Practitioner Nelson knew or should have known Dr. Busch's assessment of McFadden's condition and recommended treatment were unreliable. There is no extrinsic evidence suggesting the failure to obtain a second opinion in the circumstances presented fell below professional standards of care. And insofar as Nurse Practitioner Nelson knew McFadden requested a second opinion, any decision she made was within her medical judgment, which the Court will not second guess. *See Pearson*, 850 F.3d at 538–39 (affirming summary judgment for nurse where plaintiff failed to produce extrinsic evidence of "a substantial departure from accepted professional judgment, practice, and standards").

Also, as counsel for McFadden conceded at oral argument, Nurse Practitioner Nelson did not personally receive the emails McFadden sent to the Health Services account. Although the

personnel who monitored the account would mention or forward certain emails to Nurse Practitioner Nelson, there is no evidence she knew McFadden requested a second opinion from an outside specialist. Similar to Dr. Dalmasi, Nurse Practitioner Nelson can only be liable for her own conduct and knowledge. *See Ziglar*, 137 S. Ct. at 1860. McFadden cannot impute the knowledge and decisions of other FDC personnel to Nurse Practitioner Nelson to establish she was subjectively deliberately indifferent to his complaints and requests for a second opinion. Nurse Practitioner Nelson is thus entitled to summary judgment on this claim. *See Pearson v. Vaughn*, 102 F. Supp. 2d 282, 289 (E.D. Pa. 2000) (granting summary judgment for defendant where plaintiff failed to show the defendant's participation, knowledge, or acquiescence in the alleged violation).

### IV.    Conduct after August 2016 in Response to Deviated Septum

Finally, McFadden argues he was denied or delayed treatment when, after Nurse Practitioner Nelson advised him to discontinue the use of Flonase, he was provided no other treatment in response to his continuing complaints of symptoms. At oral argument, McFadden's counsel argued that once Flonase was terminated sometime in August 2016, Defendants became aware McFadden suffered from a deviated septum—a condition not identified or diagnosed in Dr. Busch's report—yet did not seek other treatment options or send McFadden to another specialist. Specifically, in a clinical encounter note of a visit with McFadden on October 10, 2017, Nurse Practitioner Kistler reported McFadden had a deviated septum and prescribed ibuprofen. Nurse Practitioner Kistler's clinical encounter note from this day was not required to be signed by an FDC physician. *See* Pl.'s Ex. 110. McFadden argues that after this clinical encounter and new diagnosis, Defendants denied him any treatment, and have continued to do so to this date.

McFadden's argument on this ground fails as to all three Defendants. Nurse Sogo's last conduct in the record was a clinical encounter with McFadden on May 29, 2016. Without any evidence of Nurse Sogo's personal involvement in McFadden's care after that visit, he cannot be liable for being deliberately indifferent to a serious medical need after May 29, 2016. *See Ziglar*, 137 S. Ct. at 1860. The Court will grant summary judgment for Nurse Sogo as to this claim.

Dr. Dalmasi's last conduct in the record is her co-signing of Nurse Practitioner Nelson's clinical encounter note from August 30, 2016. Beyond this date, there is no evidence of Dr. Dalmasi's personal involvement in McFadden's care. As a result, Dr. Dalmasi cannot be deliberately indifferent to a serious medical need after August 30, 2016.

Although McFadden's counsel argued Nurse Practitioner Kistler was acting under Dr. Dalmasi's supervision as the clinical director of the FDC when she diagnosed McFadden with a deviated septum on October 17, 2017, and did not prescribe new treatment in response to that new diagnosis, Dr. Dalmasi cannot be liable under the theory of respondeat superior. *See Ziglar*, 137 S. Ct. at 1860 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." (citing *Ashcroft*, 556 U.S. at 676 )). There is no evidence in the record establishing Dr. Dalmasi knew Nurse Practitioner Kistler diagnosed McFadden with a deviated septum or that McFadden required treatment for that diagnosis. In fact, the clinical encounter note in which Nurse Practitioner Kistler notes the deviated septum diagnosis did not have to be co-signed by an FDC physician, and Dr. Dalmasi did not co-sign that clinical encounter. *See* Pl.'s Ex. 110. From this evidence, the Court can only infer Dr. Dalmasi had no knowledge of McFadden's deviated septum. Therefore, because Dr. Dalmasi had no personal involvement in any alleged wrongs that occurred after August 30, 2016, she is entitled to summary judgment on this claim and the Court will grant her motion.

Although Nurse Practitioner Nelson had personal involvement in McFadden's medical care after August 2016, she is nonetheless entitled to summary judgment because McFadden cannot establish she was subjectively aware of McFadden's deviated septum. After August 2016, Nurse Practitioner Nelson saw McFadden on only a few occasions. The record reflects that Nurse Practitioner Nelson saw McFadden on May 25, 2017, August 15, 2017, and September 25, 2017. Each of these clinical encounters occurred before Nurse Practitioner Kistler diagnosed McFadden with a deviated septum. McFadden thus cannot establish Nurse Practitioner Nelson knew of the deviated septum and denied him treatment for it. As a result, Nurse Practitioner Nelson cannot be charged with deliberate indifference to McFadden's deviated septum. Nurse Practitioner Nelson is entitled to summary judgment on this claim and the Court will grant her motion.

To the extent McFadden argues Nurse Practitioner Nelson denied him any treatment after August 2016, but before he was diagnosed with a deviated septum, this claim also lacks merit. At each encounter in 2017, Nurse Practitioner Nelson heard McFadden's complaints and responded to them. On May 25, 2017, Nurse Practitioner Nelson re-prescribed Flonase in response to McFadden's continued complaints of the same symptoms for which she had previously prescribed Flonase. On August 15, 2017, Nurse Practitioner Nelson responded to McFadden's complaints of fever, sinus problems, and throat pain. She prescribed an antibiotic and ibuprofen, and advised McFadden to rest and drink plenty of fluids. On September 25, 2017, Nurse Practitioner Nelson advised McFadden he could treat his symptoms with cold and allergy pills from commissary and addressed his other unrelated complaints.

Insofar as McFadden alleges Nurse Practitioner Nelson denied or delayed care, there is no evidence in the record establishing Nurse Practitioner Nelson refused to see McFadden for his symptoms during this period. Rather, the evidence shows Nurse Practitioner Nelson provided

McFadden with treatment or advice in each of her encounters with him based on the symptoms he presented. McFadden's claim here is thus properly characterized as an adequacy of care claim. McFadden must show Nurse Practitioner Nelson's care fell below professional standards and that she subjectively acted with deliberate indifference.

In the three encounters with McFadden, Nurse Practitioner Nelson provided treatment for his complaints. She re-prescribed Flonase to address the ongoing symptoms from which Dr. Busch recommended the use of Flonase. As with her earlier decision to continue the use of Flonase, there is nothing in the record suggesting Nurse Practitioner Nelson's conduct fell below professional standards of care. The only evidence in the record is to the contrary. Both of Defendants' experts state McFadden's chronic symptoms were treatable with Flonase, and no further treatment was medically necessary. Without extrinsic evidence from which a jury could infer this treatment was inadequate, which McFadden has not produced, a reasonable jury could not find Nurse Practitioner Nelson acted with deliberate indifference after August 2016. Nurse Practitioner Nelson is thus entitled to summary judgment on this claim as well.

**CONCLUSION**

For the reasons set forth above, the Court will grant Defendants' motions for summary judgment and enter judgment in favor of Defendants on all counts.

An appropriate Order follows.

BY THE COURT:


 /s/  Juan R. Sánchez
Juan R. Sánchez, C.J.